**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RUSSELL A. BISHOP,

Plaintiff,

v.

SHERIFF MARK A. HACKEL, DEPUTY JAMES STANLEY, DEPUTY JOHN CANTEA, DEPUTY S. ANDERMAN, SGT. KEVIN HARTLEY, CAPTAIN ROBERTS, LT. MOORE, J/A SANBORN, DEPUTY HARRELL, and DEPUTY LAURA HOGAN, Jointly and Severally

Defendants.

_____________________________________/

Case No. 07-14259

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART BOTH (1) DEFENDANT HOGAN'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT AND (2) THE REMAINING COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Before the Court are Defendant Laura Hogan's Motion to Dismiss and for Summary Judgment, (Doc. 54), and the remaining defendants' (hereinafter "County Defendants") Motion for Summary Judgment, (Doc. 51). In his complaint, Plaintiff Russell Bishop asserts that the defendants violated his right to be free from cruel and unusual punishment when they kept him housed in a unit where he would be subjected to repeated sexual abuse. Bishop also contends that the defendants negligently failed to protect him from, and prevent, the sexual abuse he suffered while he was incarcerated. In addition, Bishop claims that Defendant Mark Hackel, the Macomb

County Sheriff, had policies or customs that failed to prevent inmates from being sexually assaulted by other inmates, and that resulted in Bishop being sexually assaulted.

For the reasons discussed below, Defendant Hogan's request for summary judgment of Bishop's § 1983 claim against her is granted, and Hogan's request for dismissal of Bishop's negligence claim against her is denied. The County Defendants' Motion for Summary Judgment is granted to the extent it relates to Bishop's gross negligence claim against all the County Defendants, and Bishop's § 1983 claims against Defendants Roberts, Moore, Hartley, and Sanborn. The County Defendants' Motion for Summary Judgment is denied, however, to the extent it relates to Bishop's § 1983 claims against Defendants Hackel, Stanley, Cantea, Anderman, and Harrell.

## II. STATEMENT OF FACTS

On December 1, 2004, Bishop was charged with assault with intent to do great bodily harm less than murder. Upon his incarceration, Bishop's initial classification form stated that he had been in a number of mental institutions and had previously attempted suicide. It also indicated that Bishop was depressed, confused, and exhibiting bizarre behavior.

During booking, Defendant Harrell determined that Bishop needed constant supervision and that a mental health referral was needed. Subsequently, Correctional Medical Services ("CMS"), which provided mental health services for the inmates, indicated that it would be appropriate to move Bishop into the Mental Health Unit. On

December 10, Defendant Laura Hogan, a limited license psychologist with CMS,[1] indicated that Bishop could be placed in the "Mental Health Step-Down Unit," also known as the D-12 unit. The Mental Health Step-Down Unit is for mental health patients who have been stabilized.

On November 25, 2004, a Charlie Floyd was charged with multiple counts of criminal sexual conduct. On December 10, Scott Webster, a limited license psychologist with CMS, notified the shift commander that Floyd was appropriate for placement in the Mental Health Step-Down Unit. Floyd was housed in the Mental Health Step-Down Unit with Bishop from December 10-13 and December 19-25. Floyd is five feet, nine inches tall, and he weighs 160 pounds. Bishop is four inches shorter than Floyd, but the same weight. On December 13, 2004, Floyd was accused of a major rule violation when he was seen throwing food trays at a jail trustee. Floyd denied throwing trays or hitting the trustee, but admitted to horseplay. He was found guilty of horseplay and placed in administrative segregation from December 14-19.

On December 25, 2004, Bishop met with Hogan for a mental health visit. Hogan reports that, during the visit, Bishop told Hogan that he was upset because Floyd wanted to touch his penis. According to Hogan, Bishop said that he had not told any of the corrections officers about this. Hogan told Bishop that he could prosecute Floyd for inappropriate sexual behavior, and Bishop said he wanted to talk to a corrections officer about the situation. Bishop could not remember the date of the incident. Hogan was obligated to, and did, confirm that Bishop was stable.

---

[1] The complaint appears to have incorrectly identified Hogan as a deputy.

Hogan advised Defendant James Stanley, a corrections officer, about Bishop's allegation. Hogan stated that once she notified custody of the situation, "it then became a custody issue." She understood that, once corrections officers were informed of a sexual assault, the officers were obligated to separate the inmates. Hogan then scheduled Bishop for a psychiatric evaluation, which was completed within 48 hours. The psychiatric evaluation diagnosed Bishop with schizo affective disorder.

Stanley was working with Defendants John Cantea and S. Anderman. Stanley and Anderman spoke with Bishop on December 25, and he informed them that Floyd was sexually assaulting him. Stanley claims this is the first he heard of any such assaults. Records indicate that Floyd was placed "on lockdown" that day and moved from the Mental Health Step-Down Unit due to accusations of sexual assault.

Stanley handed out witness statement forms to other inmates in the Mental Health Step-Down Unit, and all the forms that were returned to Stanley indicated that Floyd was physically and sexually abusive to several inmates. Stanley then interviewed various people about Floyd. Inmate Huffman reported that Floyd had said that Bishop was cute. Inmate Bradford complained that Floyd had forced him to masturbate Floyd to ejaculation.

Bishop reported to Stanley that, at first, Floyd had stolen his food trays and only let him eat the bread. Floyd then started taking Bishop's hand and forcing him to touch his penis. After this, Floyd began laying in bed with Bishop, forcing his pants down, and rubbing his penis against Bishop. Floyd also masturbated on Bishop, and he tried to have Bishop perform oral sex on him. Floyd told Bishop that he would kill him if he told

any of the corrections officers. More recently, Floyd struck Bishop, which caused him to hit his head on his bunk.

Floyd denied having any trouble with any inmates and stated, "I'm just here to do my time." Floyd was not questioned for specifics because of the possibility of criminal charges. Stanley submitted paperwork concerning the allegations against Floyd to his supervisor, Defendant Kevin Hartley. A protective order was then put in place to keep Floyd and Bishop from having any contact with each other. From December 25 through Bishop's January 3, 2005, release, Floyd was kept in lockdown for 23 hours a day in the Mental Health Unit while Bishop remained in the Mental Health Step-Down Unit.

Bishop testified at his deposition that, upon first meeting Floyd in the Mental Health Step-Down Unit, Floyd told him that he was a "really bad guy" and then threw Bishop's head "against the bed." Floyd also stole Bishop's food, and when Bishop told the correctional officers about this, they did not do anything. Bishop does not remember how many days later it was that Floyd "started doing sexual things to me . . . most of the time. He would come up to me and he would try to pull my pants down or something like that." Bishop proceeded to provide testimony concerning Floyd's inappropriate sexual behavior that was consistent with the previously discussed statement he made to Stanley. Bishop repeatedly told the correctional officers about Floyd sexually assaulting him, but they did nothing to stop it. Bishop states that his December 25, 2004, statement constituted his only written statement concerning the incidents of sexual assault by Floyd. Bishop did not remember if he ever saw Floyd after he submitted the written statement.

Bishop stated that he only saw Hogan one time, and he did not remember when this occurred. He believed Hogan was a mental health counselor and that they determined where the inmates should be held. Bishop stated that he did not tell Hogan about any of his problems with Floyd. Nevertheless, he believed that Hogan should have removed him from the cell with Floyd because an officer should have told her what was happening.

Stanley testified that he had never been trained on the topic of sexual predators in jail. In addition, Stanley did not know of any policies, protocols, or procedures that dealt with how to prevent sexual predators from victimizing other inmates inside jail. He stated that once the corrections officers learned of a sexual assault, they would lock the accused inmate in his cell by himself, complete a jail incident report, pass out witness statement forms to all inmates in the unit, and get the inmate into maximum security or another part of the jail where he is housed by himself. In addition, the inmate's classification was raised. Stanley also testified that it was not uncommon to have four or five sexual predators in the Mental Health Unit.

Bishop presented a report from Michael Hackett, a criminal justice consultant. Hackett stated that prisons classify prisoners in order to "separate the criminally sophisticated from the naive, the violent from the non-violent, the aggressive from the passive, predators from the prey." Hackett believed Bishop was particularly vulnerable because he "was young, small and apparently 'slow.'" In addition, he did not have experience of life in jail. Placing an inmate such as Bishop in a cell with an older, stronger, and predatory inmate like Floyd put Bishop in grave danger. Because there appeared to be no evidence of mental health issues with Floyd, and the fact that Floyd

was reclassified to a maximum security level both during the remainder of his confinement, Hacket believed that the staff knew or should have known that Floyd should not have been housed in the Mental Health Step-Down Unit. Hackett went on to conclude that the corrections officers' act of ignoring Bishop's complaints regarding Floyd's sexual assaults constituted deliberate indifference.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows a district court to dismiss a complaint that fails "to state a claim upon which relief may be granted." "This rule allows a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if every allegation in the complaint is true." Tidik v. Ritsema, 938 F.Supp. 416, 421 (E.D. Mich. 1996). Thus, when faced with a Rule 12(b)(6) motion to dismiss, a district court "must construe the complaint in the light most favorable to the plaintiff, [and] accept all factual allegations as true." Allard v. Weitzman, 991 F.2d 1236, 1240 (6th Cir. 1993).

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." There is no genuine issue of material fact if there is not a factual dispute that could affect the legal outcome on the issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant summary judgment, this Court "must construe the evidence and draw

all reasonable inferences in favor of the nonmoving party." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008).

## IV. ANALYSIS

### 1. Bishop's § 1983 Claims

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must (1) allege the violation of a constitutional right, and (2) show that the violation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). The Supreme Court has held that "the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner. County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998) (quotation and alteration omitted). The Eighth Amendment provides prisoners with the right to receive medical care during their incarceration. Estelle v. Gamble, 429 U.S. 97, 103 (1976). In particular, "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. Id. In addition, the Eighth Amendment requires prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). Such conduct violates the Eighth Amendment when it is both "sufficiently serious," and when the prison officials are "deliberately indifferent" to the inmate's health or safety. Id. at 834.

"Deliberate indifference" has both an objective and a subjective component. Perez v. Oakland County, 466 F.3d 416, 423 (6th Cir. 2006). In order to establish the subjective component, the Plaintiff must present evidence that the prison official was

subjectively aware of, and disregarded, the risk of harm to the prisoner. Id. at 424. In other words,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer, 511 U.S. at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. at 842. But, a prison official who was not aware of a substantial risk of harm may not be held liable under the Eighth Amendment, even if the risk was obvious and a reasonable official would have noticed it. Id. at 841-42.

*a. Defendant Hogan*

As an initial matter, there is no evidence that Hogan's handling of the situation after Bishop told her about the sexual assaults on December 25, 2004, violated Bishop's rights. After hearing Bishop's complaint, Hogan informed the corrections officers of the situation so that they would separate the inmates, which they did. Furthermore, there is no evidence that Bishop and Floyd had any contact after that point in time. Accordingly, after Hogan received Bishop's December 25, 2004, complaint, she successfully acted to stop the sexual assaults against Bishop. Furthermore, because there is no evidence indicating that Hogan knew of the sexual assaults before December 25, 2004, the only remaining issue is whether Hogan was aware at an earlier

point in time that there was an excessive risk that Bishop would be sexually assaulted. See Farmer, 511 U.S. at 837.

There were factors that might have indicated that Bishop would be at such a risk. In particular, (1) Floyd was four inches taller than Bishop; (2) Floyd was charged with various sex-based offenses; and (3) Bishop may have been vulnerable because he was young, had a history of mental illness, appeared to be confused during his intake evaluation, and was thought to be "slow." Bishop, however, has presented no evidence indicating that Hogan knew about Floyd and his history of sexual assault. It was a different limited licensed psychologist who found that Floyd could be placed in the Mental Health Step-Down Unit. The evidence indicates only that Hogan knew that Bishop was young, had a history of mental illness, and appeared to be confused and slow.

Since there is no evidence that Hogan knew about Floyd, the evidence does not show that Hogan both (1) knew that placing Bishop in the Mental Health Step-Down Unit put him in excessive risk of being assaulted, and (2) deliberately disregarded that risk. See id. This is especially true in light of the fact that Bishop himself was charged with assault to do great bodily harm less than murder, a very serious crime. Accordingly, Bishop has failed to present evidence showing that Hogan violated his constitutional rights, and the Court grants Hogan's Motion for Summary Judgment of Bishop's § 1983 claim against her. See Farmer, 511 U.S. at 833.

*b. County Defendants*

*i. Qualified Immunity*

The County Defendants argue that Bishop's § 1983 claims fail because they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S.Ct. 808, 815 (2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). This calls for two steps of analysis. Courts must determine both whether (1) the facts that the plaintiff alleged make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's misconduct. Id. at 815-16.

As an initial matter, an inmate's right to be protected from harm by other inmates is clearly established. See Leary v. Livingston County, 528 F.3d 438, 443 (6th Cir. 2008) (citing Farmer, 511 U.S. at 833). Furthermore, there is evidence based upon which a jury could find that Bishop's constitutional rights were violated when he was put in the same cell as Floyd. In particular, the officers were aware that Floyd was incarcerated for several violent felonies, including sexual assault. There is also evidence that the corrections officers were aware that Bishop was young, small in size, suffering from severe mental illness, and exhibiting a lack of full mental functioning. In addition, Bishop testified that he told the corrections officers before December 25, 2004, that Floyd was sexually assaulting him, and they ignored his complaints. Although the corrections officers and Hogan dispute Bishop's claim that he told the officers before

December 25, 2004, about the sexual assaults, the Court must construe the evidence in Bishop's favor. See Hawkins, 517 F.3d at 332.

Based on the evidence, a jury could conclude that the corrections officers were aware of a substantial risk of harm to Bishop and chose to ignore it; thereby violating Bishop's constitutional rights. Accordingly, the County Defendants are not entitled to qualified immunity and, because Defendants Stanley, Cantea, Anderman, and Hartley offer no other ground for summary judgment, Bishop's § 1983 claims against those four defendants must survive.

*ii. Defendant Sheriff Mark Hackel*

A municipality can be sued through its sheriff if the municipality causes a constitutional deprivation through its policies or customs. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91; Kroes v. Smith, 540 F.Supp. 1295, 1298 (E.D. Mich. 1982). A municipality cannot be sued, however, solely on the basis of an injury inflicted by its employees or agents. Monell, 436 U.S. at 694. "[T]o satisfy the Monell requirements a plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." Garner v. Memphis Police Dep't, 8 F.3d 358, 364 (6th Cir. 1993) (quotation omitted). "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). Furthermore, the Supreme Court has held that it is possible, in light of the duties

assigned to specific officers, for the need for training to be so obvious that the lack of such training would constitute deliberate indifference. Id. at 390.

Bishop claims that the defendants were not properly trained regarding how to avoid creating an excessive risk that inmates who are sexual predators would sexually assault other inmates. This allegation is supported by Defendant Stanley's testimony that the corrections officers received no training, and there were no policies, procedures, or protocols, concerning how to prevent sexual predators from sexually assaulting other inmates. Furthermore, as previously discussed, there is a genuine issue of material fact regarding whether or not the corrections officers violated Bishop's constitutional rights by being deliberately indifferent to an excessive risk that he would be harmed. A jury could conclude that this violation of Bishop's constitutional rights occurred as a result of the aforementioned lack of training. Accordingly, there is a genuine issue of material fact regarding whether there is adequate training. In particular, due to the significant number of sexual predators in jail, a jury could find that the need for such training was so obvious that not providing it constituted deliberate indifference. See id. Therefore, the County Defendants' Motion for Summary Judgment is denied as it relates to Defendant Hackel.

*iii. Defendants Roberts, Moore, Hartley, and Sanborn*

Bishop claims that Defendants Roberts, Moore, Hartley, and Sanborn are liable under § 1983 because they were supervisors and the corrections officers did not receive adequate training, which caused them to violate Bishop's constitutional rights. Unlike a claim of municipal liability, a claim of individual supervisory liability based on a

failure-to-train theory must "point to a specific action of each individual supervisor to defeat a qualified immunity claim." Phillips v. Roane County, Tenn., 534 F.3d 531, 544 (6th Cir. 2008). Bishop has not pointed to any specific actions by these supervisors. Instead, he only makes general claims about the lack of training. This is insufficient to make these defendants liable under § 1983 as supervisors. See id. Accordingly, the County Defendants' Motion for Summary Judgment is granted as to Defendants Roberts, Moore, Hartley, and Sanborn.

2. Bishop's Gross Negligence/Gross Negligence Claim

*a. Hogan*

Hogan argues that the only negligence-based claim that Bishop could have against her would be for medical malpractice and not for negligence or gross negligence, as alleged in the complaint. Furthermore, Hogan asserts that any medical malpractice claim must fail because Bishop did not satisfy the various prerequisites for filing a medical malpractice claim. Bishop responds that his claim against Bishop is not a medical malpractice claim because it does not involve medical judgment.

Medical malpractice claims (1) "can occur only within the course of a professional relationship," and (2) "necessarily raise questions involving medical judgment." Bryant v. Oakpointe Villa Nursing Centre, 471 Mich. 411, 422 (2004) (quotations omitted). Claims of ordinary negligence, on the other hand, raise questions "that are within the common knowledge and experience of the fact-finder." Id. (quotation and alteration omitted).

Bishop's claim against Hogan is a claim of ordinary negligence and not medical malpractice. In essence, Bishop claims that Hogan had a duty to protect him from being sexually assaulted, and that she breached this duty by failing to recognize that incarcerating him in the Mental Health Step-Down Unit with Floyd put him in danger of being sexual assaulted. The determination of whether being incarcerated with Floyd subjected Bishop to an unreasonable danger of being sexually assaulted is not an issue of medical judgment. Corrections officers routinely make such determinations without the benefit of medical expertise. Likewise, a jury, without the aid of expert medical testimony, could use its common knowledge and experience to determine whether incarcerating Bishop and Floyd together constituted negligence. See id. at 423 (indicating that medical malpractice claims raise questions of medical judgment that require expert testimony). As such, Bishop has adequately pled a claim of ordinary negligence against Hogan. See id. at 422. Accordingly, Hogan's request that the Court dismiss this claim is denied.[2]

*b. County Defendants*

Generally, employees of government agencies are immune from tort liability for acts they commit within the scope of their employment. M.C.L. § 691.1407(2). They are not immune, however, if their conduct amounts to gross negligence. M.C.L. § 691.1407(2)(c). "'Gross negligence' means conduct so reckless as to demonstrate a

[2] Hogan has only asked for summary judgment of Bishop's § 1983 claim. Therefore, the Court will not address whether summary judgment of Bishop's negligence claim against Hogan might be appropriate.

substantial lack of concern for whether an injury results." M.C.L. § 691.1407(7)(a). In order for such gross negligence to be the proximate cause of the plaintiff's injury, it must be "the one most immediate, efficient, and direct cause of the injury or damage." Robinson v. City of Detroit, 462 Mich. 439, 462 (2000).

In Miller v. Lord, the Michigan Court of Appeals addressed a gross negligence claim against various school teachers at a school where the plaintiff, a student, was sexually assaulted by another student. 262 Mich. App. 640 (2004). The court held that the defendants were entitled to governmental immunity because the sexual assault itself, and not the teachers' actions, were "the" proximate cause of plaintiff's injuries. Id. at 644. The court determined that if a defendant's conduct is not the proximate cause of a plaintiff's injuries, then the defendant is entitled to governmental immunity, and it did not need to address whether the defendant's actions were grossly negligent. Id. at 644 n.1.

In this case, "the one most immediate, efficient, and direct cause of the injury or damage" to Bishop was Floyd's act of sexually assaulting Bishop, and not the County Defendants' alleged deliberate indifference to the risk of harm to Bishop. See id. at 644; Robinson, 462 Mich. at 462. Accordingly, the County Defendants are entitled to governmental immunity because their actions were not the proximate cause of Bishop's injuries. See Miller, 262 Mich. App. at 644 n.1. Therefore, the Court grants the County Defendants' Motion for Summary Judgment to the extent it relates to the gross negligence claim against them.

## V. CONCLUSION

Accordingly, both Defendant Hogan's Motion to Dismiss and for Summary Judgment, (Doc. 54), and the County Defendants' Motion for Summary Judgment, (Doc. 51) are **GRANTED IN PART AND DENIED IN PART**.

Defendant Hogan's Motion to Dismiss and for Summary Judgment is granted to the extent it requests summary judgment of Bishop's § 1983 claim against her, and denied to the extent that it requests dismissal of Bishop's negligence claim against her.

The County Defendants' Motion for Summary Judgment is granted to the extent it relates to (1) Bishop's § 1983 claims against Defendants Roberts, Moore, Hartley, and Sanborn, and (2) Bishop's gross negligence claim against all the County Defendants.[3] The County Defendants' Motion for Summary Judgment is denied, however, to the extent it relates to the § 1983 claim against Defendants Hackel, Stanley, Cantea, Anderman, and Harrell.

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATED: May 26, 2009

[3] As previously discussed, the County Defendants include all of the defendants in this case except for Defendant Laura Hogan.

**CERTIFICATE OF SERVICE**

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt
DEPUTY CLERK