**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RUSSELL A. BISHOP,

                Plaintiff,

v.

                                          Case No. 07-14259

SHERIFF MARK A. HACKEL, DEPUTY
JAMES STANLEY, DEPUTY JOHN CANTEA,           HON. MARIANNE O. BATTANI
DEPUTY S. ANDERMAN, SGT. KEVIN
HARTLEY, CAPTAIN ROBERTS, LT. MOORE,
J/A SANBORN, DEPUTY HARRELL, and
DEPUTY LAURA HOGAN, Jointly and
Severally

                Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANT HOGAN'S MOTION FOR**
**SUMMARY JUDGMENT OF PLAINTIFF'S NEGLIGENCE / GROSS NEGLIGENCE**
**CLAIM**

**I.     INTRODUCTION**

This case involves Plaintiff Russell Bishop's claim that Defendants violated his

right to be free from cruel and unusual punishment when they kept him housed in a

prison unit where he would be subjected to repeated sexual abuse.  Bishop also

contends that Defendants negligently failed to protect him from, and prevent, the sexual

abuse he suffered while he was incarcerated.  This Court previously granted

Defendants' motions for summary judgment of, among other things, all of Bishop's

claims against Defendant Laura Hogan except for his claim that she was negligent

and/or grossly negligent.  (Doc. 69).  Defendant Laura Hogan now moves for summary

judgment of Bishop's negligence/gross negligence claim.  (Doc. 74).  For the reasons

discussed below, the Court **GRANTS** Defendant's Motion for Summary Judgment.


II.       **STATEMENT OF FACTS**

On December 1, 2004, Bishop was charged with assault with intent to do great

bodily harm less than murder.  Upon his incarceration, Bishop's initial classification form

stated that he had been in a number of mental institutions and had previously attempted

suicide.  It also indicated that Bishop was depressed, confused, and exhibiting bizarre

behavior.

During booking, Defendant Harrell determined that Bishop needed constant

supervision and that a mental health referral was needed.  Subsequently, Correctional

Medical Services ("CMS"), which provided mental health services for the inmates,

indicated that it would be appropriate to move Bishop into the Mental Health Unit.  On

December 10, Defendant Laura Hogan, a limited license psychologist with CMS,[1]

indicated that Bishop could be placed in the "Mental Health Step-Down Unit," also

known as the D-12 unit.  The Mental Health Step-Down Unit is for mental health

patients who have been stabilized.

On December 10, Scott Webster, a limited license psychologist with CMS,

notified the shift commander that Charlie Floyd, an inmate who had been charged with

multiple counts of criminal sexual conduct, could be placed in the Mental Health Step-

Down Unit.  Floyd was housed with Bishop in the Mental Health Step-Down Unit from

---

[1] The complaint appears to have incorrectly identified Hogan as a deputy.

December 10-13 and December 19-25.  On December 13, 2004, Floyd was accused of a major rule violation when he was seen throwing food trays at a jail trustee.  Floyd denied throwing trays or hitting the trustee, but admitted to horseplay.  He was found guilty of horseplay and placed in administrative segregation from December 14-19.

On December 25, 2004, Bishop met with Hogan for a mental health visit.  Hogan reports that, during the visit, Bishop told Hogan that he was upset because Floyd wanted to touch his penis.  According to Hogan, Bishop said that he had not told any of the corrections officers about this.  Hogan told Bishop that he could prosecute Floyd for inappropriate sexual behavior, and Bishop said he wanted to talk to a corrections officer about the situation.  Bishop could not remember the date of the incident.  Hogan was obligated to, and did, confirm that Bishop was stable.

Hogan advised Defendant James Stanley, a corrections officer, about Bishop's allegation.  Hogan stated that once she notified custody of the situation it was a custody issue.  She understood that once corrections officers were informed of a sexual assault, they were obligated to separate the inmates.  Hogan then scheduled Bishop for a psychiatric evaluation, which was completed within 48 hours.  The psychiatric evaluation diagnosed Bishop with schizoaffective disorder.

Stanley testified that it was not uncommon to have four or five sexual predators in the Mental Health Unit.  Stanley spoke with Bishop on December 25, and Bishop stated that Floyd was sexually assaulting him.  Floyd was moved from the Mental Health Step-Down Unit that day and placed "on lockdown" due to the accusations of sexual assault.  Stanley handed out witness statement forms to other inmates in the Mental Health Step-Down Unit, and all the forms that were returned to Stanley indicated

3

that Floyd was physically and sexually abusive to several inmates.  Stanley then

interviewed various people about Floyd.  Inmate Huffman reported that Floyd had said

that Bishop was cute.  Inmate Bradford complained that Floyd had forced him to

masturbate Floyd to ejaculation.

Bishop reported to Stanley that, at first, Floyd had stolen his food trays and only

let him eat the bread.  Floyd then started taking Bishop's hand and forcing him to touch

his penis.  After this, Floyd began laying in bed with Bishop, forcing his pants down, and

rubbing his penis against Bishop.  Floyd also masturbated on Bishop, and he tried to

have Bishop perform oral sex on him.  Floyd told Bishop that he would kill him if he told

any of the corrections officers.  More recently, Floyd struck Bishop, which caused

Bishop to hit his head on his bunk.

Floyd denied having any trouble with any inmates and stated, "I'm just here to do

my time."  Floyd was not questioned for specifics because of the possibility of criminal

charges.  A protective order was put in place to keep Floyd and Bishop from having any

contact with each other.  From December 25, 2004, through Bishop's January 3, 2005,

release, Floyd was kept in lockdown for 23 hours a day in the Mental Health Unit while

Bishop remained in the Mental Health Step-Down Unit.

Bishop testified at his deposition that, upon first meeting Floyd in the Mental

Health Step-Down Unit, Floyd told him that he was a "really bad guy" and then threw

Bishop's head "against the bed."  Floyd also stole Bishop's food, and when Bishop told

the corrections officers about this, they did not do anything.  Bishop does not remember

how many days later it was that Floyd "started doing sexual things to me . . . most of the

time.  He would come up to me and he would try to pull my pants down or something

4

like that." Bishop proceeded to provide testimony concerning Floyd's inappropriate sexual behavior that was consistent with the previously discussed statement he made to Stanley. Bishop repeatedly told the corrections officers about Floyd sexually assaulting him, but they did nothing to stop it. Bishop states that his December 25, 2004, statement constituted his only written statement concerning the incidents of sexual assault by Floyd. Bishop did not remember if he ever saw Floyd after he submitted the written statement.

Bishop stated that he only saw Hogan one time, and he did not remember when this occurred. He believed Hogan was a mental health counselor and that they determined where the inmates should be held. Bishop stated that he did not tell Hogan about any of his problems with Floyd. Nevertheless, he believed that Hogan should have removed him from the cell with Floyd because an officer should have told her what was happening.

Bishop presented a report from Michael Hackett, a criminal justice consultant. Hackett stated that prisons classify prisoners in order to "separate the criminally sophisticated from the naive, the violent from the non-violent, the aggressive from the passive, predators from the prey." Hackett believed Bishop was particularly vulnerable because he "was young, small and apparently 'slow.'" In addition, he did not have experience of life in jail. Hackett stated that placing an inmate such as Bishop in a cell with an older, stronger, and predatory inmate like Floyd put Bishop in grave danger. Because there appeared to be no evidence of mental health issues with Floyd, and the fact that Floyd was reclassified to a maximum security level both during the remainder of his confinement, Hacket believed that the staff knew or should have known that Floyd

5

should not have been housed in the Mental Health Step-Down Unit.  Hackett went on to conclude that the corrections officers' act of ignoring Bishop's complaints regarding Floyd's sexual assaults constituted deliberate indifference.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) authorizes the Court to grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  There is no genuine issue of material fact if there is not a factual dispute that could affect the legal outcome on the issue.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether to grant summary judgment, this Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party."  Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008).

## IV.    ANALYSIS

### A.    Negligence

"To establish a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages."  Case v. Consumers Power Co., 463 Mich. 1, 6 (2000) (footnote omitted).  Individuals are generally under a duty to act with ordinary care,

which "means the care that a reasonably careful person would use under the circumstances."  Id.

In this case, Bishop has not presented evidence showing that Hogan negligently failed to prevent Bishop from being sexually assaulted.  Hogan presumably knew that Bishop was young, had a history of mental illness, appeared to be confused during his intake evaluation, and was thought to be slow.  But, there is no evidence that Hogan knew about Floyd and his history of sexual assault, as it was a different limited licensed psychologist that determined that Floyd could be placed in the Mental Health Step-Down Unit.

Although Stanley testified that there were commonly individuals with histories of being sexual predators in both the Mental Health Unit and the Mental Health Step-Down Unit, he did not differentiate between the Mental Health Unit (where Bishop was before Hogan determined that he could be transferred) and the Mental Health Step-Down Unit (the unit that Hogan determined Bishop could be transferred to and where Bishop encountered Floyd).  Furthermore, Hogan testified that the corrections officers provided the same level of supervision over the Mental Health Unit and the Mental Health Step-Down Unit.  Therefore, there is not evidence indicating that Bishop's risk of being sexually assaulted was higher in the Mental Health Step-Down Unit than it was in the Mental Health Unit.  As such, there is no evidence indicating that Hogan negligently caused, or failed to prevent Bishop's sexual assault when she determined that he could be moved from the Mental Health Unit to the Mental Health Step-Down Unit.

**B.      Gross Negligence**

"'Gross negligence' means conduct so reckless as to demonstrate a substantial

lack of concern for whether an injury results."  M.C.L. § 691.1407(7)(a).  For the same

reasons that this Court has found that Hogan was neither negligent nor deliberately

indifferent to Bishop's health and safety, the Court also finds that Hogan was not grossly

negligent.  (See doc. 69 at 9-10); see also Soles v. Ingham County, 316 F.Supp.2d 536,

546 (W.D. Mich. 2004) (stating that the "definition of gross negligence under Michigan

law establishes a standard materially indistinguishable, as applied to the facts of this

case, from the deliberate indifference standard discussed . . . in connection with

plaintiff's § 1983 claims").


**V.      CONCLUSION**

Accordingly, the Court **GRANTS** Defendant Hogan's Motion for Summary

Judgment Regarding Plaintiff's Negligence / Gross Negligence Claim.  (doc. 74).

**IT IS SO ORDERED.**


                                        s/Marianne O. Battani
                                        MARIANNE O. BATTANI
                                        UNITED STATES DISTRICT JUDGE


DATED: September 15, 2009

<u>CERTIFICATE OF SERV ICE</u>

I hereby certify that on the above date a copy of this Opinion and Order was

served upon counsel of record via the Court's ECF System.

<u>s/Bernadette M. Thebolt</u>

## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and electronic filing.

_____
DEPUTY CLERK